UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GREGG M.S. BERGER, <br> FRANCIS A. TRIBBLE, <br> HOW WAI HUI, a.k.a. JOHN HUI, <br> KWONG-CHUNG CHAN, a.k.a. BERNARD CHAN, <br> XIAOQING DU, a.k.a. ANGELA DU, <br> GLOBAL PEOPLELINE TELECOM, INC., <br> CHI SHING NG, a.k.a. DANIEL NG, <br> CHINA DIGITAL MEDIA CORPORATION, <br> MORDECHAI BROUDO, <br> SHAY BEN-ASULIN, and <br> M-WISE, INC., <br><br> Defendants. | C.A. No. |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.     This matter involves international schemes to fraudulently pump and dump the publicly traded securities of eight U.S. microcap companies headquartered in the People's Republic of China ("PRC"), Canada and Israel (hereinafter "the Public Companies") through spam e-mail campaigns which generated proceeds in excess of $33.6 million. Each scheme was primarily organized and devised either by defendant Francis A. Tribble ("Tribble"), a stock promoter, defendants How Wai Hui, a.k.a. "John Hui" ("Hui") and Kwong-Chung Chan, a.k.a.,

"Bernard Chan" ("Chan"), prominent Chinese businessmen and former officers of China World Trade Corporation, or defendant Gregg M.S. Berger ("Berger"), a New York-based stockbroker and long-time friend of Tribble. Between at least January 2005 through in or around December 2007 ("relevant time period"), these defendants, along with certain corporate officers and directors, engaged in a scheme to pump up the price and volume of the securities of one or more of the issuers by paying for false spam e-mail campaigns that touted the securities of the Public Companies.

2.     The spam e-mails lured investors into the market by, among other things, touting non-existent Initial Public Offerings ("IPOs") and acquisitions, presenting an unrealistic picture of the Public Companies' business prospects, providing baseless share price projections, and/or including false disclaimers concealing the defendants' identities and their payments for the e-mails. These defendants then dumped millions of shares in one or more of these Public Companies into the pumped or hyped market through nominee accounts, reaping millions of dollars in profits.

3.     Tribble and Hui devised and masterminded the pump-and-dump schemes in the securities of at least five of the issuers, China World Trade Corporation ("CWTD"), Pingchuan Pharmaceuticals, Inc. ("PGCN"), Worldwide Biotech and Pharmaceuticals, Inc. ("WWBP"), defendant China Digital Media Corporation ("CDGT"), and China Mobility Solutions, Inc. ("CHMS") (now defendant Global Peopleline Telecom, Inc. ("GPPL")). Tribble also participated in the schemes to pump and dump two other stocks, defendant m-Wise, Inc. ("MWIS") and Score One, Inc. ("SREA"). At all relevant times, the common stock of all of these issuers was dually quoted on the Over-the-Counter Bulletin Board ("OTCBB") and Pink Sheets operated by OTC Markets Group, Inc. ("Pink Sheets").

2

4.     Chan masterminded the pump and dumps of SREA and another issuer, Physical Property Holdings, Inc. ("PPYH"), and he also participated in the pump and dumps of CWTD, PGCN, WWBP, CDGT, and CHMS by recording and tracking the sales of these stocks and by arranging for payment of the unlawful spam e-mail campaigns.

5.     Berger organized and arranged the pump and dump of MWIS. He also facilitated the sale of 38.5 million shares of the Public Companies' securities into the public market during the spam e-mail campaigns, on behalf of the other defendants, through at least 30 brokerage accounts that were opened in the names of nominees or straw parties. In addition, Berger facilitated the transfer of the illicit proceeds to bank accounts from which the other defendants would transfer cash to themselves and others involved in the schemes.

6.     Defendant Xiaoqing Du, a.k.a. "Angela Du" ("Du"), the Chief Executive Officer and director of GPPL, defendant Chi Shing Ng, a.k.a. "Daniel Ng," ("Ng"), the Chief Executive Officer and director of CDGT, defendant Shay Ben-Asulin ("Ben-Asulin"), the former Chairman of MWIS, and defendant Mordechai Broudo ("Broudo"), the former Chief Executive Officer of MWIS (collectively "Corporate Insiders") participated and assisted in the pump-and-dump schemes of their respective issuer by coordinating the release of corporate news with the spam e-mail campaigns, paying for the promotion through the sales of their own stock, and by issuing purportedly unrestricted shares of stock to themselves and the promoters, or nominees of the promoters, in order to dump those shares into the market.

7.     As a result of the conduct described in this Complaint, defendant Berger violated, or in the alternative aided and abetted violations of, Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      As a result of the conduct described in this Complaint, defendants Tribble and Chan violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      As a result of the conduct described in this Complaint, defendants Hui, Du, Ben-Asulin, and Broudo violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 10(b) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78p] and Rules 10b-5, 13a-14, 16a-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.16a-2, and 240.16a-3]; and aided and abetted violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)], and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

10.      As a result of the conduct described in this Complaint, defendant Ng violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 10(b) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78p] and Rules 10b-5, 13a-14, 16a-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.16a-2, and 240.16a-3]; and aided and abetted violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 13a-11].

11.      As a result of the conduct described in this Complaint, defendant CDGT violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5,

4

12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-11].

      12.    As a result of the conduct described in this Complaint, defendants MWIS and GPPL violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, and 13a-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-1].

## JURISDICTION AND VENUE

      13.    The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to enjoin such acts, transactions, practices, and courses of business; obtain disgorgement and civil penalties; and for other appropriate relief.

      14.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

      15.    Venue is proper because certain of the acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Michigan, including the origination of the unlawful spam e-mail campaigns described herein.

      16.    In connection with the conduct alleged in this Complaint, the defendants directly or indirectly made use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

### A.    Individuals

17.    **Gregg M.S. Berger**, age 47, resides in Yonkers, New York. From in or around January 2002 to in or around May 2006, he was a registered representative associated with Gilford Securities, Inc. ("Gilford Securities"), which has been registered with the Commission as a broker-dealer since 1979. From in or around June 2006 to in or around February 2008, he was a registered representative at Capital Growth Financial, LLC ("Capital Growth"), which was registered with the Commission as a broker-dealer until February 2008. He has been in the securities industry since 1992. He holds Series 3, 7, 31, and 63 securities licenses.

18.    **Francis A. Tribble**, age 43, is incarcerated in federal prison in Detroit, Michigan. From at least January 2005 through at least December 2007, he was a stock promoter and primary architect of several of the pump-and-dump schemes. During the relevant period, Tribble lived primarily in Los Angeles, California. In November 2009, he was sentenced to 51 months in prison after he pled guilty to violating a federal anti-spam statute and mail and wire fraud for sending false and misleading, unsolicited e-mails to artificially inflate the price of the common stock of CDGT, CWTD, PGCN, and WWBP. He also pled guilty to receiving payments for the spam e-mail campaigns from the sales of those stocks whose prices were inflated by the spam e-mails. In 1998, Tribble consented to a permanent injunction from violations of Section 17(b) of the Exchange Act and paid a civil penalty of $15,000. See SEC v. Francis Tribble, et al., 98-CV-8699 (C.D. Cal. Oct. 27, 1998).

19.    **How Wai Hui**, age 52, is a dual citizen of Hong Kong and Canada. He is incarcerated in federal prison in Youngstown, Ohio. Prior to his incarceration, he primarily resided in Vancouver, British Columbia, Canada. From in or around 2000 until his resignation in

6

January 2006, Hui was the Chief Executive Officer and Vice Chairman of the Board of Directors at CWTD. In November 2009, he was sentenced to 51 months in prison after he pled guilty to violating a federal anti-spam statute and mail and wire fraud for sending false and misleading, unsolicited e-mails to artificially inflate the price of the common stock of CDGT, CWTD, PGCN, and WWBP. He also pled guilty to receiving payments for the spam e-mail campaigns from the sales of those stocks whose prices were inflated by the spam e-mails.

20.     **Kwong-Chung Chan**, age 46, is a resident and citizen of Hong Kong, PRC. From in or around May 2004 to in or around February 2006, he served as CWTD's Chief Financial Officer. Chan is a financial advisor and, together with his financial advisory firm Nuada Limited, is registered with the Hong Kong Securities and Futures Commission.

21.     **Chi Shing Ng**, age 46, is a resident and citizen of Hong Kong, PRC. From at least January 2005 to the present, Ng has served as CDGT's Chairman, Chief Executive Officer, and President.

22.     **Mordechai Broudo,** age 52, is a citizen of Italy and resident of Israel. He is a co-founder of MWIS. At all relevant times, Broudo was the Chief Executive Officer of MWIS. From at least February 2007 to the present, Broudo has been the Secretary and Chairman of the Board of Directors of MWIS.

23.     **Shay Ben-Asulin**, age 42, is a citizen and resident of Israel. He is a co-founder of MWIS. He has been a member of MWIS' Board of Directors since its inception, and from at least January 2003 through December 2006, served as Chairman of the Board of Directors.

24.     **XiaoQing Du**, age 40, is a dual citizen of Canada and China. Her last known address is in Vancouver, British Columbia, Canada. Since at least June 2004, she has been the

7

Chief Executive Officer, President and a director of GPPL which, during the fraudulent schemes, was known as CHMS.

## B. Entities

25.    **China Digital Media Corp.** is a Nevada corporation with its principal executive offices located in Hong Kong, PRC. It is in the business of cable TV operations, digital television technology development and trading of TV contents in China. At all relevant times, CDGT's stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and the company filed periodic reports on Forms 10-K and 10-KSB, and Forms 10-Q and 10-QSB. At all relevant times, CDGT was dually quoted on the OTCBB and Pink Sheets under the ticker symbol "CDGT."

26.    **m-Wise, Inc.** is a Delaware corporation with its principal place of business in Herzeliya Pituach, Israel. It develops, manufactures, markets and supports a software and hardware-based wireless application platform marketed under the brand MOMA platform. At all relevant times, MWIS' stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and it filed periodic reports on Forms 10-K and 10-Q. MWIS' stock was dually quoted on the OTCBB and Pink Sheets under the ticker symbol "MWIS."

27.    **Global Peopleline Telecom, Inc. (formerly known as China Mobility Solutions, Inc.)** is a Florida corporation with its principal executive offices located in Vancouver, British Columbia, Canada. It purports to be a leading provider of mobile business solutions to corporations across China. GPPL's stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and it is required to file periodic reports on Forms 10-Q and 10-K. At all relevant times, the company operated under the name CHMS until its merger with PeopleLine Telecom, a privately-held Chinese company, in 2007. At all relevant

8

times, CHMS' stock was dually quoted on the OTCBB and Pink Sheets under the ticker symbol "CHMS."

## FACTS

### A. Overview of the Pump-and-Dump Schemes

28.　　The fraudulent pump-and-dump schemes typically followed the same pattern. Hui or others associated with CWTD located a private Chinese company to reverse merge with a U.S. public shell company. As part of the reverse merger, the shell company typically conducted a reverse stock split and changed its name. A reverse stock split reduces the number of shares in a company and increases the share price proportionately.

29.　　The Public Companies, at the direction of Hui, Tribble, Chan, and others, issued large blocks of unrestricted shares, purportedly pursuant to Form S-8 or Rule 144 of the Securities Act, to nominees, whose names were being used to disguise the defendants' beneficial ownership, for little or no cost. These shares were often the only unrestricted shares issued by the Public Companies, thereby enabling Tribble and others to control the entire float of the issuer's stock. Prior to the spam e-mail campaigns, there was little or no trading volume in the securities of any of the Public Companies, which often traded at prices below $1.

30.　　In the weeks leading up to the promotional campaign, either Hui, Chan, the corporate insiders of the Public Companies, or others acting at their direction, opened brokerage accounts with Berger in the names of straw parties or nominees (the "Nominee Accounts") and deposited the Public Companies' securities. The nominees were generally Chinese nationals or entities that were beneficially owned by Chinese nationals.

31.　　Next, Tribble, Hui, Chan or Berger coordinated the launch of spam e-mail campaigns touting these low-priced stocks, which corresponded with press release campaigns

purporting to announce positive, newsworthy events that hyped the Public Companies' business. The spam e-mails for each issuer contained the same false and misleading information and baseless price projections. Some of the e-mails contained false and misleading language concerning purported acquisitions and IPOs. These e-mails were intended to pump or increase the prices of the securities and/or create demand for the securities. These campaigns often created a short term spike in volume and price.

32. The spam e-mails were primarily drafted at the direction of Tribble, who enlisted Alan Ralsky ("Ralsky"), the self-proclaimed "King of Spam," and Ralsky's team of technicians (collectively the "spammers"), to draft and send the false and misleading spam e-mails. Ralsky and one of his technicians resided in West Bloomfield, Michigan.

33. Simultaneous with, or shortly after, the spam e-mail campaigns were launched, Berger, at the direction of the other defendants, sold the entire holdings in the securities of these Public Companies in the Nominee Accounts. These holdings often represented the only stock traded in the accounts.

34. Finally, often pursuant to instructions from Tribble, Hui, Chan, and the Corporate Insiders of the Public Companies or others working on their behalf or at their direction, Berger immediately wired out the entire proceeds of those sales to foreign bank accounts in the name of those nominees. Subsequently, the proceeds were used to pay Tribble, Hui, Chan, CWTD, and the spammers. Also, in some instances, a portion of the proceeds was also sent directly back to the issuer or Corporate Insiders, who had concealed their beneficial ownership and trading in their respective issuer's securities.

**B.    Roles in the Scheme**

35.    Throughout the course of the scheme, all of the defendants engaged in fraud, deception, and material misrepresentations to conceal their actions.

### 1. Defendants Tribble, Hui, and Chan

36.    Defendant Tribble played a central role in each of the pump-and-dump schemes. He was responsible for creating liquidity in the market, arranging the false spam e-mail campaigns, and coordinating the release of the spam e-mail and press releases with the large block sales by Berger's purported customers. Tribble directed the release of the spam and corporate news, and instructed Berger when and how much stock to sell in the Nominee Accounts. Tribble established bank accounts in the U.S. and Hong Kong in his name and the names of entities he controlled in order to facilitate payments to spammers from the proceeds of the sale of the Public Companies' stocks.

37.    Tribble engaged in the aforementioned conduct for the purpose of pumping or increasing the prices of the Public Companies' securities, and to enrich himself by profiting from the sales of the Public Companies' securities during the spam e-mail campaigns.

38.    Defendant Hui was the dealmaker in the schemes. He found and advised private Chinese companies to reverse merge with U.S. public companies as a means to access capital in the U.S. markets. Hui contracted with Tribble to arrange for spam e-mail campaigns in CWTD, CDGT, CHMS, PGCN, and WWBP. He directed or arranged for these companies to issue shares to him or in the names of nominees which he then deposited, or directed others to deposit, into brokerage accounts held with Berger. Hui also directed or arranged for the transfer of the proceeds from the sales of these stocks through foreign bank accounts, many of which were located in Hong Kong or mainland China.

11

39.     Hui engaged in the fraudulent schemes in order to raise millions of dollars for CWTD and enrich himself and others by profiting from the sales of CWTD, CDGT, CHMS, PGCN, and WWBP at increased or affected prices that resulted from the spam e-mail campaigns.

40.     Defendant Chan participated in and assisted Tribble and Hui in the fraudulent schemes to pump and dump the stocks of WWBP, PGCN, CWTD, CDGT, and CHMS. Chan served as CWTD's CFO and he was responsible for recording and tracking the sales of these stocks and for arranging payments to the spammers from the stock sale proceeds. Specifically, Chan had access to and signing authority over a CWTD-associated bank account that received millions of dollars from the pump-and-dump schemes. Chan transferred millions of dollars from this bank account to pay Tribble and the spammers for the promotion of at least some of the Public Companies' securities.

41.     Chan also often assisted Hui with his fraudulent conduct by, among other things, communicating with Berger on the timing and amounts of wire transfers, tracing the illicit proceeds from each bank account, and tracking the stock sales through the Nominee Accounts.

42.     Further, Chan opened two Nominee Accounts with Berger at Gilford Securities in order to sell CHMS stock when he knew that CHMS' securities were the subject of a false spam e-mail campaign.

43.     In addition, in or around late 2006 to in or around December 2007, Chan became a dealmaker himself. During this time period, he brought at least two companies, SREA and PPYH, directly to Tribble and others to promote through spam e-mail for the purpose of dumping shares he controlled into the pump.

### 2. Defendant Berger

44.     During the relevant period, defendant Berger's retail brokerage business consisted almost exclusively of sell-side trading in low-priced, thinly-traded stocks that were quoted or traded on the over-the-counter markets.  Berger referred to this type of brokerage business as a "liquidation business."

45.     During the relevant period, Berger entered and, in some instances executed, orders to sell over $33 million of low-priced, thinly-traded stocks that were the subject of spam e-mail campaigns in the Nominee Accounts.

46.     From in or around April 2005 to in or around December 2007, Berger fraudulently earned gross commissions of approximately $1.2 million from the sales of the Public Companies' securities and personally received approximately $684,542 of those proceeds.

47.     During the relevant period, Berger opened at least 30 Nominee Accounts at the direction of Tribble, Hui, Chan, the Corporate Insiders, or others acting at their direction, for the sole purpose of selling low-priced stocks that were the subject of spam e-mail campaigns.

48.     Tribble, Hui, Chan, the Corporate Insiders, or others acting at their direction, provided Berger with the account opening documentation for the Nominee Accounts, which typically included a new account form, passport, and tax forms in the names of the nominees.  None of the defendants' names, or the individuals acting at their direction, ever appeared on the accounts, and they did not have written trading authorization or power of attorney over the accounts.

49.     Berger knew, or was reckless in not knowing, that Tribble, Hui, Chan and the Corporate Insiders opened the Nominee Accounts for the purpose of hiding their involvement in the pump-and-dump schemes.

50.     Tribble and Berger have been friends since the early 1990s. During the relevant period, Berger and Tribble spoke several times a day. Berger accepted trading instructions from Tribble for the Nominee Accounts. Tribble often told Berger to sell a certain percentage of stock through the Nominee Accounts.

51.     Berger knew Tribble was a stock promoter and that Tribble was promoting the stocks of the Public Companies while Tribble and the other defendants were selling those stocks in the Nominee Accounts. Berger further knew or was reckless in not knowing that the stocks that they were selling in the Nominee Accounts were the subject of false spam e-mail campaigns. For example, Berger received spam e-mails from some of the Public Companies in his own e-mail account.

52.     In addition to accepting sell order from Tribble and others, Berger routinely provided transaction details, cash and share balances, wire transfer information, and online username and password information for the nominee accounts to Tribble, Hui, Chan, the Corporate Insiders, and others acting at their direction, enabling the other defendants to control and monitor the Nominee Accounts and track the stocks sales, proceeds, and wire amounts reflected in the accounts.

53.     In furtherance of the scheme, Berger disregarded and violated several internal policies and procedures at Gilford Securities in order to sell shares of CDGT, CHMS, WWBP, CWTD, PGCN, and MWIS.

54.     Berger also organized and arranged the fraudulent scheme of one of the Public Companies, MWIS. Berger contracted with Tribble and the spammers to promote the stock for MWIS. He also arranged for payment of the promotion of MWIS to be made from the proceeds of MWIS stock that he was selling through brokerage accounts.

14

55.     Further, Berger purchased and sold the stocks of CDGT, CWTD, CMHS, PGCN, and PPYH through his own brokerage accounts and in the brokerage accounts of his family and friends in the weeks and days leading up to the spam e-mail campaigns in these stocks. He made these purchases and sales in his own account to create the appearance of trading activity in the stock and/or an active or liquid market.

56.     In connection with each of the pump-and-dump schemes, Berger obtained "free-trading" shares for the Nominee Accounts from the Public Companies' transfer agents. Berger prepared and sent documentation that contained false and misleading information to the transfer agents for the purpose of removing the restricted legends from the stock certificates that were deposited into the Nominee Accounts, which allowed Berger to publicly sell the stock on behalf of the Nominee Accounts. Berger sent this documentation to purportedly comply with the safe harbor provisions of Rule 144 of the Securities Act, which provides a way to obtain "free-trading" shares to sell to the public without filing a registration statement with the Commission, provided that certain conditions are met. This documentation included a broker's representation letter, seller's representation letter, and legal opinion to the transfer agents of the issuers.

57.     By handling and executing sell orders for the Nominee Accounts, Berger, directly or indirectly, participated in the distribution of securities to the public market involving millions of shares of the Public Companies. Accordingly, Berger acted as an underwriter. Berger did not conduct a reasonable inquiry into the Public Companies prior to selling their shares through the Nominee Accounts.

58.     During the relevant period, in addition to receiving commissions on the sell orders, Berger also received compensation from Tribble. Tribble compensated Berger for his role in the pump-and-dump schemes by, among other things, paying for Berger's entertainment

15

at nightclubs and bars, paying for a trip to Las Vegas, Nevada, giving him cash, and a watch. Hui also compensated Berger by delivering him cash in person. Berger never reported any of this compensation or gifts to his employers.

### 3. Defendants Du, Ng, Ben-Asulin, and Broudo

59.     Defendants Du, Ng, Ben-Asulin and Broudo played a central role in the pump-and-dump schemes by coordinating the release of corporate news with the spam e-mail campaigns, paying for the promotion through the sales of their own stock, and by issuing purportedly unrestricted shares of stock to themselves and the promoters, or nominees of the promoters, in order to dump those shares into the market.

60.     Du, Ng, Ben-Asulin and Broudo opened Nominee Accounts with Berger for the purpose of selling their respective issuer's stock during the promotional campaigns. They then sold this stock to raise capital for their respective issuer and/or to enrich themselves after the value had been fraudulently inflated.

61.     Du, Ng, Broudo, and Ben-Asulin directed Berger to transfer the proceeds from the sales of their stock through the Nominee Accounts to bank accounts held outside of the United States. They then transferred or arranged for the transfer of a portion of those proceeds to pay for the spam e-mails campaigns and/or promotion of their issuer's stock. Du, Ng, Broudo, and Ben-Asulin knew or were reckless in not knowing that the promotions for which they paid had either caused price and/or volume increases in their issuer's stock and/or had created a market for the stock.

62.     Hui, Du, Ng, Broudo, and Ben-Asulin also caused their respective issuer to issue or transfer unrestricted shares to their nominees or to the promoters. They did so by filing fraudulent Form S-8 registration statements with the Commission, improperly relying upon

registration exemptions under the Securities Act, or improperly relying upon the safe harbor provisions of Rule 144. They also signed letters to the transfer agent of their issuer that instructed that transfer agent to issue "free-trading" or unrestricted shares pursuant to these registration statements, registration exemptions, or safe harbors.

63.     Hui, Du, Ng, Ben-Asulin, and Broudo knowingly, or recklessly, failed to disclose their sales of stock or the payments for the stock promotions to the public or in any public filings made by the issuers with the Commission. As a result, the annual reports filed by their respective issuer with the Commission were false and misleading. Moreover, Hui, Du, Ng, Ben-Asulin, and Broudo knew or were reckless in not knowing their obligations under the federal securities laws as public company directors and/or officers to report their trading on Forms 3 and 4, public documents filed with the Commission. They also knew or were reckless in not knowing that the investing public routinely used such disclosures to, among other things, gauge the sentiment of public companies' insiders and large shareholders about those companies' financial condition and prospects, thereby relying on them in making investment decisions. Despite their knowledge, they created a false impression as to their actual holdings and trading in their respective issuer's securities.

## C.     Description of Pump and Dump in Each Issuer

### 1.  China World Trade Corporation

64.     At all relevant times, CWTD was a Nevada corporation headquartered in Guangzhou, China. CWTD's business involved establishing business clubs, and providing business travel and value-added services to customers. CWTD was dually quoted on the OTCBB and Pink Sheets under the ticker symbol "CWTD." CWTD securities were registered

with the Commission pursuant to Section 12(g) of the Exchange Act and it filed periodic reports on Forms 10-KSB and 10-QSB.

65.    From at least January 2005 through at least May 2006, Hui, Tribble, Chan, and Berger engaged in a scheme to pump and dump CWTD stock through false and misleading spam e-mail campaigns for the purpose of raising money for CWTD and enriching themselves. The spam e-mail campaigns were coordinated with corporate actions by CWTD.

### a. CWTD Promotional Campaign and Market Effect

66.    From on or about February 11, 2004 to at least May 2006, CWTD was the subject of several fraudulent spam e-mail campaigns that were coordinated and directed by Hui and Tribble. The spam e-mail campaigns contained, among other things, materially false and misleading statements and baseless price projections. (*e.g.,* "Current Price: $.92, 3-5 Day Estimate: $3.50, Buy: 'Strong'"). The CWTD spam e-mails also either contained no disclaimer and/or contained materially false and misleading disclaimers. The e-mails did not disclose that Hui and other CWTD officers and directors had orchestrated a scheme to pump the price of CWTD stock for the purpose of dumping their shares into the market, or that they paid for the spam e-mails.

67.    Some e-mails contained a materially false disclaimer that the publisher was receiving "six hundred thousand free trading shares from a third party, not an officer, director or affiliate shareholder for the circulation of the report." These disclaimers were false because, contrary to the representations in the disclaimers, an officer and director of CWTD did pay for the promotion and the promoters were paid in cash not in stock. The promotion was made for the purpose and with the knowledge that Hui and others would sell their shares into the pump.

68. On or about February 11, 2004, the first spam e-mail campaign in the securities of CWTD was launched at the direction of Tribble, Hui, and others at CWTD, and it had an immediate and significant effect on the price and volume of CWTD stock. On February 12, 2004, the day after the spam e-mail commenced, CWTD stock opened at $1.50, traded as high as $2.55, and closed at $2.10, on volume of 401,678 shares. This represented a 76 percent increase over the previous day's close of $1.19, and a 1,295 percent increase over the previous day's volume of 28,800 shares. Less than a week later, on February 17, 2004, CWTD's stock price reached a high of $9.20 per share. After this date the stock steadily declined, trading in a range of $1.07 to $8.45 for the remainder of 2004.

69. On or around February 18, 2005, Berger and Tribble began buying and selling small amounts (between 500 and 3,000 shares) of CWTD through brokerage accounts held in their own names and the names of their family and close friends. They purchased a total of 33,500 shares, at prices ranging from $1.95 to $2.72. Of the 33,500 shares, Berger purchased 11,500 shares through brokerage accounts in his or his wife's name. Berger made these purchases in his own account and the accounts of his family and friends when he knew, or was reckless in not knowing, that Hui and Tribble were launching a spam e-mail campaign in CWTD.

70. In or around April 2005, Hui and Tribble paid for another spam e-mail campaign in CWTD. On June 1, 2005, the stock price reached a 2005 high of $3.44 on volume of 442,522 shares. After this date, CWTD's stock price never again reached $3.00.

### b. CWTD Dump

71. In furtherance of CWTD's pump-and-dump scheme, from on or about May 17, 2005 to on or about November 16, 2006, Berger assisted Hui, Tribble, Chan and others who were

associated with CWTD, with selling at least 4,814,868 shares of CWTD stock through at least ten Nominee Accounts. These sales generated proceeds of $8,561,732. At the direction of Hui, Tribble, Chan, and others acting at their direction, Berger wired the stock sale proceeds from these accounts to offshore bank accounts held in the names of the nominees. A portion of these proceeds were then transferred from the nominees' offshore bank accounts to CWTD, Hui, Tribble, and the spammers. For example, on or about August 17, 2005, a Nominee Account controlled by Hui transferred $581,255 from the proceeds of the sale of CWTD stock to an offshore bank account. On or about August 19, 2005, $247,012 of the $581,255 was transferred to a spammer's bank account.

72. There was no registration statement on file or in effect with the Commission or an applicable exemption when many of the sales of CWTD stock were made through the Nominee Accounts.

73. In 2006, the stock traded in a price range of $.20 to $2.82, with average daily volume of 200,240 shares. On April 25, 2006, volume peaked at 3,689,675 shares. In or around mid-2007, after the spam e-mail campaign ended, the stock price sharply declined.

### 2. m-Wise, Inc.

74. From at least July 2005 to on or about February 10, 2006, Berger and Tribble, together with MWIS' Chairman and CEO, Ben-Asulin and Broudo, engaged in a scheme to pump and dump MWIS stock through false and misleading spam e-mail campaigns for the purpose of raising money for MWIS and enriching themselves.

75. During the promotional campaign, Berger arranged for and assisted Ben-Asulin and Broudo with the sale of nearly 12 million shares of MWIS stock through offshore entities, generating over $2.2 million in proceeds. Approximately one-half of those proceeds were used

to benefit MWIS, Ben-Asulin and Broudo, and the balance was used to pay Berger and Tribble for the false promotion of MWIS stock.

76.     In or around July 2005, Berger devised and coordinated a scheme to pump and dump MWIS stock in order to raise capital for MWIS. Berger approached Ben-Asulin and Broudo and told them that he could help the company raise capital by selling shares of MWIS stock through brokerage accounts at Gilford Securities. As part of the scheme, Berger, Ben-Asulin, and Broudo agreed that Berger would be entitled to 50 percent of the proceeds from any sales of m-Wise stock. Berger then approached Ralsky and Tribble to launch a spam e-mail campaign in MWIS.

### a. MWIS Promotional Campaign and Market Effect

77.     From on or about July 21, 2005 to on or about February 8, 2006, MWIS was the subject of a spam e-mail campaign orchestrated and directed by Berger and Tribble. The spam e-mail campaign was coordinated with corporate actions by MWIS. The spam e-mails contained materially false disclaimers, and provided for baseless price and profit projections (*e.g.,* Current Price: $.19, 1 Week Projection: $.75 to $1.00; "This is the one that could make you 300-500% profit!!!").

78.     The m-Wise spam e-mails either contained no disclaimer and/or contained materially false and misleading disclaimers. Some e-mails contained a materially false disclaimer that the publisher was receiving "two hundred thousand free trading shares from a third party, not an officer, director or affiliate shareholder for the circulation of the report." These disclaimers were false because, contrary to the representations in the disclaimers, an officer and director of m-Wise did pay for the promotion and the promoters were paid in cash not in stock.

21

79.     The spam e-mail campaign had an immediate and stabilizing effect on the price

and volume of the stock.  In the 30 days preceding the spam e-mail campaign, MWIS stock did

not trade over $.13 per share and had an average daily volume of 24,468 shares.  On July 21,

2005, the day the campaign commenced, MWIS stock opened at $.12, traded as high as $.30, and

closed at $.24 on a volume of 448,950 shares.  This represented a 118 percent increase over the

previous day's close of $.11 and a 648 percent increase over the previous day's volume of

60,000 shares.  Twenty-nine percent of the volume that day was comprised of purchases made by

three brokerage accounts at Gilford that were controlled by Berger and Tribble, and a brokerage

account in the name of a spammer.  During the MWIS spam e-mail campaign, the stock traded in

a range of $.12 to $.30, with volume ranging from 11,300 to 3,704,062 shares.

### b.  MWIS Dump

80.     In furtherance of the scheme, from on or about July 27, 2005 to on or about

February 10, 2006, Berger intentionally assisted Ben-Asulin and Broudo with selling 11,942,468

MWIS shares through the two Nominee Accounts that were opened in the names of a Belize

corporation and an Isle of Man corporation.  These sales generated proceeds of $2,264,541.

Ben-Asulin provided, or directed others to provide, Berger with the account opening

documentation for these accounts and Ben-Asulin arranged for the transfer of MWIS shares into

these accounts.  Ben-Asulin and Broudo did not disclose to the public any of their sales through

these accounts.  These sales represented 20 percent of the 60,542,871 shares traded during that

period.  On the days that Berger sold MWIS stock through these two Nominee Accounts, the

sales represented five percent and 79 percent of the total daily volume.

81.     At Berger's direction, Ben-Asulin and Broudo sent approximately $750,000 from

the proceeds of the sale of MWIS stock to Tribble to pay for the fraudulent promotional

campaign. For example, on or about October 11, 2006, at Berger's direction, Ben-Asulin and Broudo sent a wire transfer to Tribble for approximately $261,449 which they obtained from the proceeds of their sales of MWIS to pay for the promotion.

82.     There was no registration statement on file or in effect with the Commission or an applicable exemption when all of the sales of m-Wise stock were made through the two Nominee Accounts.

83.     After the spam e-mail campaign ended, MWIS's stock price slowly declined, and by the end of 2006, reached a low of $.068.

### 3. China Digital Media Corporation

84.     From at least June 2005 through in or around December 2005, Hui, Tribble, Chan, Ng, and Berger engaged in a scheme to pump and dump CDGT stock through the issuance of false and misleading spam e-mails. Ng, through CDGT, improperly issued unrestricted shares of CDGT stock to nominees through a fraudulent Regulation E offering in order to secretly sell these shares to raise capital for the company, and to pay for its promotion.

### a. CDGT Regulation E Offering and Reverse Merger

85.     Regulation E provides an exemption from the registration requirements of Section 5 of the Securities Act for certain offerings by a business development company ("BDC"). A BDC, among other things, must have its principal place of business within the United States and operate for the purpose of making investments in securities. Under this provision, a qualifying BDC may raise up to $5 million in a one-year period through sales of securities to the public without filing a registration statement for the securities sold. A Form 1-E filing initiates a Regulation E offering. A Form 2-E is to be filed every six months during an offering or upon termination of an offering.

86. On or about December 28, 2004, Arcotect Digital Technology Limited ("Arcotect"), a private Hong Kong-based cable company owned by Ng, entered into a reverse merger agreement with Hairmax, Inc. ("Hairmax"), a U.S. BDC that invested in hair salons. As a result of the merger, Ng acquired 99 percent of the voting power, 100 percent of the convertible Series A preferred stock, and became the CEO and Chairman of Hairmax.

87. On January 10, 2005, Ng caused Hairmax to file a Form 8-K which he knew or was reckless in not knowing contained false and misleading information concerning Hairmax's future prospects as a BDC, its intentions to seek equity financing for the company, and Hairmax's completion of the reverse merger with Arcotect.

88. The reverse merger agreement provided that the merger could not be completed until Hairmax withdrew its election as a BDC because Arcotect, which would be the surviving company, did not meet the definition of a BDC as it was a Hong Kong-based cable company.

89. Ng caused Hairmax to delay the completion of the reverse merger in order to use Hairmax's existing BDC status as a vehicle to make an offering of securities pursuant to Regulation E of the Securities Act, which allowed Ng to obtain and issue to Hui and his nominees "free-trading" or unrestricted shares of Hairmax, which later became CDGT. Hairmax issued 6,835,462 shares of Hairmax common stock worth $2,305,275 pursuant to the Regulation E exemption. These shares were the only unrestricted shares of Hairmax, which later became CDGT, in the public market which allowed Tribble to control the float of the stock. In order to issue these shares pursuant to the Regulation E exemption, Ng caused Hairmax to make two false and misleading public filings on Forms 1-E and 2-E.

90.     On or about January 13, 2005, Ng caused Hairmax to file a Form 1-E stating that it was raising $4.8 million in capital and falsely stating that no shares were being offered through underwriters, dealers, or salespersons.

91.     On or about February 7, 2005, Ng caused Hairmax to file a Form 2-E stating that the offering was closed and falsely stating that 6,835,462 shares of Hairmax had been issued to six investors in exchange for ninety-day notes.

92.     At the time Ng signed these filings, he knew or was reckless in not knowing that the filings contained false and misleading information.

93.     On or about March 28, 2005, after Ng completed the Regulation E offering, Hairmax and Arcotect completed their reverse merger, and Ng changed Hairmax's name to China Digital Media Corp.

### b.   CDGT's Promotional Campaign and Market Effect

94.     The issuance of the unrestricted shares pursuant to the Regulation E offering were part of the scheme to pump up the price for CDGT stock and then dump those shares into a rising market.

95.     From approximately April 29, 2005 through December 9, 2005, CDGT was the subject of a spam e-mail campaign.  This spam e-mail campaign was coordinated with corporate actions by CDGT.

96.     These e-mails contained materially false and misleading statements concerning, among other things, "strategic acquisitions" and IPOs, as well as baseless price projections (*e.g.*, "12 month price projections up to $15.00" and "7 day price expectations hitting a high of $18.50 per share").

97.    The CDGT spam e-mails either contained no disclaimer and/or contained materially false and misleading disclaimers. The e-mails did not disclose that Ng, Hui, Tribble and others paid for the spam e-mails.

98.    Some e-mails contained a materially false disclaimer that the publisher was receiving "six hundred thousand free trading shares from a third party, not an officer, director or affiliate shareholder for the circulation of the report." These disclaimers were false because, contrary to the representations in the disclaimers, an officer and director of CDGT did pay for the promotion and the promoters were paid in cash not in stock.

99.    Prior to these campaigns, there was virtually no market for CDGT shares. On January 10, 2005, CDGT conducted a 1:100 reverse stock split. Prior to the reverse stock split, CDGT's stock traded below a penny per share. From January 12, 2005 through March 31, 2005, CDGT stock traded in a price range of $.20 to $1.35, on average volume of 2,500 shares. From April 1, 2005 to April 28, 2005, the day prior to the spam e-mail campaign, CDGT's stock price continued to rise, trading in a price range of $1.20 to $3.01, on average daily volume of 1,600 shares.

100.    On April 28, 2005, the day prior to the spam e-mail campaign, Berger purchased 1,000 shares of CDGT stock at $2.00 per share in his own brokerage account. He sold all of those shares on the next day at $2.96 per share. On May 25, 2005, Berger again purchased 1,000 shares of CDGT stock at $3.75 per share in his own brokerage accounts. On June 17, 2005, he sold all of those shares for $4.08 per share.

101.    The spam e-mail had an immediate and significant impact on CDGT's stock price and volume. On April 29, 2005, the day the spam e-mail campaign was launched, CDGT's stock price closed at $3.25, a 63 percent increase over the previous day's close of $2.00, and traded on

a volume of 20,853 shares, a 943 percent increase of the previous day's volume of 2,000 shares. The next trading day, May 2, 2005, CDGT's stock traded as high as $6.10, with a volume of 83,000 shares. On May 5, 2005, CDGT's stock price peaked at $8.50 per share.

102.     On September 17, 2005, CDGT's volume peaked at 597,533 shares. During the spam e-mail campaign, CDGT's stock traded in a price range of $1.14 to $8.50, on an average daily volume of 85,000 shares.

### c. CDGT Dump

103.     In furtherance of the scheme, from on or about April 29, 2005 to on or about December 12, 2005, Berger assisted Ng and Hui with selling 2,881,265 shares of CDGT stock through Hui's own brokerage account and three Nominee Accounts. The sales generated proceeds of approximately $8.4 million and constituted 22 percent of the overall trading during that period. Hui and the three Nominee Accounts were the largest net sellers of CDGT stock in 2005. All of these shares were obtained directly or indirectly through the Regulation E offering. Berger never made any inquiries into the receipt or acquisition of these shares.

104.     Ng opened and controlled two of the three Nominee Accounts that netted proceeds of $3,884,209 from the sale of 1,876,256 shares of CDGT stock. Ng provided Berger with wire instructions from these purported nominees and transferred at least $1.9 million of the proceeds to subsidiaries of CDGT. Berger provided Ng with transaction details, online account information, and share and cash positions in these two accounts. Hui sold 250,000 shares of CDGT stock through his own brokerage account generating proceeds of approximately $1,317,903. The other Nominee Account that sold CDGT was controlled by Hui and others associated with CWTD. This account sold at least 750,000 shares of CDGT stock generating proceeds in excess of $3 million.

27

105. All of the proceeds generated from the sales of CDGT stock through Hui's personal brokerage account and the Nominee Account he controlled were transferred to a CWTD-associated bank account. From this bank account, $2.3 million was transferred to Tribble and the spammers for their promotion of CDGT.

106. After the spam e-mail campaign ended, CDGT's stock price significantly declined, trading below $1.00.

### 4. China Mobility Solutions, Inc. (now known as Global Peopleline)

107. From at least June 2005 through in or about November 2006, Du, Hui, Tribble, Chan, and Berger engaged in a fraudulent scheme to pump and dump CHMS stock through the issuance of false and misleading spam e-mails. Du, through CHMS, improperly issued unrestricted shares of CHMS stock to nominees in order to secretly sell these shares to raise capital for CHMS, enrich herself and pay for the unlawful spam e-mail campaign.

### a. CHMS Promotional Campaign and Market Effect

108. From on or about June 20, 2005 to on or about November 14, 2006, CHMS was the subject of a fraudulent spam e-mail campaign that was directed and coordinated by Tribble and Hui. The purpose of the fraud was to pump the price of CHMS stock and drive up demand for the stock. The spam e-mail campaign was coordinated with corporate actions by CHMS.

109. The spam e-mails were similar to the e-mails in CDGT, CHMS, WWBP, PGCN, and MWIS, wherein they touted acquisitions (*e.g.,* "It's GO TIME for CHMS. With the ACQUISITION of TopBiz the company is getting the attention it deserves. Watch this one early as the price SOARS like a HAWK!!!"), and made baseless price projections and buy recommendations (*e.g.,* Current Price: $.105; Target Price: $1.20, Recommendation: _STRNG_BUY). Some of the e-mails contained no disclaimer.

28

110.    During the spam e-mail campaign, CHMS' stock price ranged from $.08 to $.74. On August 23, 2005, approximately two months after the spam e-mail commenced, CHMS' stock price peaked at $.74. On February 2, 2006, volume peaked at 3,048,830 shares. In the three months preceding the spam campaign, CHMS stock traded in a price range of $.38 to $.55 on average volume of 55,616 shares. After the campaign ended, CHMS' stock price slowly declined, and by the end of 2006, reached a low of $.068.

### b.  CHMS Dump

111.    In furtherance of the scheme, from on or about June 24, 2005 to on or about December 13, 2006, Berger knowingly, or recklessly, assisted Du with selling 3,277,983 shares of CHMS stock through three Nominee Accounts opened with Berger at Gilford and Capital Growth. These sales generated proceeds of approximately $1.6 million.

112.    Du transferred the sale proceeds to three bank accounts she controlled in Hong Kong. Du was a co-signatory on two of those bank accounts. Du then transferred those proceeds to pay herself, Tribble, the spammers, and CWTD. For example, from on or about July 12, 2005 to November 1, 2005, Du made five separate wire transfers totaling approximately $199,399 to a bank account in the name of her husband. All of this money was obtained from the proceeds of the sale of CHMS stock sold through one of the Nominee Accounts.

113.    Berger knew that Du was the beneficial owner and controlled one of the Nominee Accounts. The nominee was an entity that was beneficially owned by a 70-year old, retired Chinese woman.

114.    Du provided Berger with all of the account opening documentation and wire instructions for the three accounts. In return, Berger provided Du with online access to and transaction details for the three Nominee Accounts.

115.    From on or about July 1, 2005 to on or about August 15, 2005, Chan also opened

two Nominee Accounts with Berger at Gilford Securities to sell CHMS stock. Chan provided all

of the account opening documentation and told Berger that these were his "own deals." From on

or about September 21, 2005 to on or about November 17, 2005, Chan deposited a total of 1.25

million shares into these two Nominee Accounts. These shares were received pursuant to Form

S-8 registration statements filed by CHMS on May 5, 2005 and November 3, 2005.

116.    In furtherance of the fraudulent scheme, from on or about September 21, 2005 to

on or about November 29, 2005, Berger knowingly, or recklessly, arranged for and assisted

Chan, with selling all 1.25 million shares through these two Nominee Accounts. These sales

generated proceeds of $552,026. From on or about October 5, 2005 to on or about December 9,

2005, Berger assisted Chan with wiring these proceeds to offshore bank accounts in the

nominees' names. From on or about October 7, 2005 to on or about December 12, 2005, Chan

transferred over 90 percent of the proceeds from these nominees' bank accounts to personal bank

accounts for Tribble and Hui.

117.    There was no registration statement on file or in effect with the Commission or an

applicable exemption when Berger, Du, and Chan sold CHMS shares through the Nominee

Accounts.

### 5.  Worldwide Biotech and Pharmaceuticals, Inc.

118.    At all relevant times, WWBP was a Delaware corporation headquartered in Xi'an,

China. It developed virus vectors, diagnostic reagents, vaccines and traditional Chinese

medicines. Its stock was registered with the Commission pursuant to Section 12(g) of the

Exchange Act and the company filed periodic reports on Forms 10-K and 10-Q. WWBP's

common stock was dually quoted on the OTCBB and Pink Sheets under the ticker symbol "WWBP."

### a. Reverse Merger and Stock Issuance

119.    On or about December 23, 2004, Sun City Industries, Inc. ("Sun City"), a U.S. public holding company for food service marketing and distribution businesses, reverse merged with Yangling Daiying Biological Engineering ("Yangling"), a private Chinese biopharmaceutical company.  As a result, Sun City changed its name to Worldwide Biotech and Pharmaceuticals, Inc. and it took over Yangling's pharmaceutical business.

120.    On May 20, 2005, WWBP filed a Form S-8 registration statement purporting to register the issuance of 5 million shares of WWBP stock to alleged consultants of the company. On June 21, 2005 and July 27, 2005, a total of two million shares were issued to two nominees for Hui, shares that were ultimately sold during the spam e-mail campaigns.  These were the only unrestricted shares issued by the company during this time period, allowing Tribble to control the entire float of WWBP's stock.

### b. WWBP Promotional Campaign and Market Effect

121.    From approximately August 20, 2005 to December 5, 2005, WWBP was the subject of a spam e-mail campaign that was coordinated by Hui and Tribble.  The spam e-mail campaigns were coordinated with corporate actions by WWBP..  These e-mails contained materially false and misleading statements concerning, among other things, an online Internet IPO, "strategic acquisitions," and the float of the stock.  Also, the spam e-mails provided baseless price projections and "buy" recommendations (*e.g.*, "Price: $2.30, 5-10 Target: $8-10, Buy: Strong, Expectations: 300-500%").

31

122. The WWBP spam e-mails either contained no disclaimer and/or contained materially false and misleading disclaimers. Some e-mails contained a materially false disclaimer that the publisher was receiving "six hundred thousand free trading shares from a third party, not an officer, director or affiliate shareholder for the circulation of the report." These disclaimers were false because, contrary to the representations in the disclaimers the promoters were paid in cash not in stock.

123. In the six months prior to the spam e-mail campaign, there was virtually no market for WWBP stock. From April 2005 through July 2005, WWBP stock traded a total of 12,750 shares on 16 of 86 trading days, in a price range of $.60 to $1.75. From August 1, 2005 to August 19, 2005, the last trading day prior to the commencement of the spam e-mail campaign, WWBP traded on three days. Specifically, on August 9, 2005, WWBP traded 100 shares at $1.05 per share. The stock did not trade again until August 18, 2005, when it opened at $2.00 and closed at a high of $4.00, on a volume of 4,400 shares. The next day, on August 19, 2005, the stock price opened at $5.50, traded as high as $6.00, and closed at $5.50, on a volume of 2,300 shares. Approximately 75 percent of the total shares traded on August 18 and 19 were made by brokerage accounts controlled by Tribble or Hui which were held with Berger at Gilford Securities.

124. The spam e-mail campaigns had an immediate and significant impact on WWBP's price and volume. On August 22, 2005, the first trading day after the spam e-mail campaign commenced, WWBP's stock price opened at $12.05, traded as high as $28.00, and closed at $8.00 on a volume of 44,660 shares. After August 22, the price of WWBP stock began to steadily decline, trading in a price range of $2.15 to $11.50 for the rest of August 2005, on average daily volume of 94,057 shares. From September 1, 2005 through December 5, 2005, the

last day of the spam e-mail campaign, WWBP traded in a price range of $.80 to $3.00, on average daily volume of 108,339 shares. On November 29, 2005, volume peaked at 665,585 shares.

### c.  WWBP Dump

125.    In furtherance of the scheme, Berger knowingly, or recklessly, assisted Hui, Tribble, Chan, and others acting at their direction, with selling 1.95 million of WWBP shares through two Nominee Accounts opened with Berger at Gilford Securities. These shares were sold at prices ranging from $1.10 to $15.00, and generated proceeds of $3,571,372. These accounts were opened and controlled by Hui or others acting at his direction. At least $2 million of these proceeds was transferred to a CWTD-associated bank account. All of these shares were received pursuant to the May 20, 2005 Form S-8 registration statement.

126.    After the spam e-mail campaign ended, WWBP's stock price significantly declined, trading consistently below $1.00 a week after the campaign ended. By March 2006, the stock was trading below $.50.

127.    There was no registration statement on file or in effect with the Commission or an applicable exemption when Berger, Hui, and Chan sold the WWBP shares through the two Nominee Accounts.

### 6.  Pingchuan Pharmaceuticals, Inc.

128.    At all relevant times, PGCN, an integrated pharmaceutical company, was incorporated in North Carolina and headquartered in Harbin Heilongjiang, PRC. PGCN has never had a class of securities registered with the Commission. PGCN stock was dually quoted on the OTCBB and Pink Sheets under the ticker symbols "PGCN" and "PGCH."

### a. Reverse Merger and Stock Issuance

129.    On or about June 16, 2004, Xenicent, a U.S. public company that was in the business of real estate consulting, entered into a reverse merger agreement with Pingchuan Pharmaceuticals, then a privately-held pharmaceutical company located in Harbin, China.

130.    On or about November 29, 2004, PGCN filed a Form S-8 registration statement purporting to register the issuance of 3 million shares of PGCN common stock. The Form S-8 filing stated that the shares were to be issued to employees, officers, directors and consultants pursuant to consulting agreements and the 2004 Non-Qualified Stock Compensation Plan. However, at least 1.3 million shares were issued to either Hui directly or indirectly through nominees. Leading up to the spam e-mail campaign, these were the only unrestricted shares in the market during this time period, allowing Tribble to control the float of the stock immediately prior to the spam e-mail campaign.

### b. PGCN Promotional Campaign and Market Effect

131.    From on or about June 11, 2005 to on or about October 25, 2006, PGCN was the subject of a spam e-mail campaign that was coordinated by Hui and Tribble. This spam campaign corresponded with a press release campaign by PGCN. These e-mails contained materially false and misleading statements concerning, among other things, an online Internet IPO, the float of the stock, and misleading comparisons to a multi-billion dollar U.S. pharmaceutical company. Also, the spam e-mails provided baseless price projections and "buy" recommendations (e.g., 7-Day Target: $4-5; 3-Month Target: $15). PGCN was also touted in spam e-mail targeting other stocks such as CDGT and MWIS in an attempt to lend credibility to the tout (e.g., "WE GAVE YOU PGCN AT $1.00 A WEEK AGO AND NOW ITS TRADING AT $2.60 AND CLIMBING"). In addition, from June 14, 2005 to July 11, 2005, PGCN issued

four false and misleading press releases announcing contracts entitling them to hundreds of thousands of dollars in revenue.

132. In the three months leading up to the spam e-mail campaign, there was virtually no market for PGCN stock. PGCN traded on only 25 of 60 trading days at price ranges from $.15 to $1.01, on an average daily volume of 5,371 shares. Berger sold through customer accounts 28,900 of 129,005 shares traded during that period, or 22 percent. On May 3, 2005 Berger purchased 5,000 shares of PGCN in his own brokerage account at $.55 per share, and on May 5, 2005, he purchased an additional 1,400 shares of PGCN at $1.00 per share.

133. The spam e-mail campaigns had an immediate and significant impact on the price and volume of PGCN stock. On June 13, 2005, the first trading day following the commencement of the spam e-mail campaign, PGCN stock opened at $2.03, a 238 percent increase over the previous trading day's opening price of $.60, traded as high as $4.00, and closed at $2.00, on volume of 41,298 shares. Two weeks later, on June 21, 2005, PGCN's stock price peaked at $4.20, and on May 1, 2006, volume peaked at 5,377,668 shares. During the spam campaign, PGCN stock traded in a range of $.10 to $4.20, on an average daily volume of 160,000 shares.

### c. PGCN Dump

134. In furtherance of the scheme, from on or about June 13, 2005, the first trading day after the spam campaign commenced, until on or around March 1, 2007, Berger assisted Hui, Chan, Tribble, and others acting at their direction, with selling at least 5,037,603 shares of PGCN through four Nominee Accounts opened with Berger at Gilford Securities. These sales generated proceeds of $5,737,819. The majority of the proceeds were transferred to CWTD,

Tribble, and the spammers. PGCN also received at least $100,000 in proceeds from the sale of 500,000 shares of Form S-8 stock through one of the Nominee Accounts.

135.    Hui also sold 250,000 shares of PGCN stock through his own brokerage account held with Berger generating proceeds of approximately $868,737. Hui transferred all of these proceeds to a CWTD-associated bank account. Hui, Chan, and/or others acting at their direction, then transferred those proceeds from the CWTD-associated bank account to Tribble and the spammers to pay for the PGCN spam e-mail campaign. Hui was issued these shares pursuant to PGCN's November 2004 Form S-8 registration statement.

136.    There was no registration statement on file or in effect with the Commission or an applicable exemption when Hui and the four Nominee Accounts sold their PGCN shares.

### 7. Score One, Inc.

137.    At all relevant times, SREA, a Nevada corporation headquartered in Hong Kong, PRC, purportedly developed real estate, developed software programs and provided financial consulting to companies seeking to be listed on the U.S. markets. SREA's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and the company filed annual and periodic reports with the Commission. SREA's common stock was dually quoted on the OTCBB and Pink Sheets.

138.    From at least June 2007 to in or around November 2007, Chan, Tribble, and Berger engaged in a scheme to pump the price of SREA through false and misleading spam e-mails and press releases. Chan, through four Nominee Accounts opened with Berger at Capital Growth, sold 5.78 million shares of SREA stock that were received through an invalid Form S-8 filing, generating proceeds of $1,472,376. The proceeds were then transferred to Chan, Tribble, individuals responsible for spamming the stock, and SREA's Chief Financial Officer.

36

### a. SREA Background and Stock Issuance

139.    SREA's Form 10-Q for the quarter ended September 30, 2007 reported a net loss of $19,886, assets of $468,127, liabilities of $0, revenue of $68,804, and a cash balance of $2,929.

140.    On or about July 31, 2006, SREA filed a Form S-8 registration statement, signed by SREA's CFO, purporting to register the issuance of 6 million shares of SREA stock to consultants for services rendered. The shares were the only unrestricted shares of SREA in the market at the time they were issued and leading up to the spam e-mail campaign, allowing Chan and Tribble to control the market for the stock.

141.    On or about January 18, 2008, SREA reported on a Form 8-K that the company's CFO had been terminated. SREA's CFO abruptly left SREA and took all of the corporate records, including all accounting records. On or about April 8, 2008, SREA filed a Form 8-K announcing that it had terminated its auditor.

### b. SREA Promotional Campaign and Market Effect

142.    From on or about June 13, 2007 to on or about September 26, 2007, SREA was the subject of a spam e-mail campaign paid for and directed by Chan which was coordinated with a press release campaign in SREA. The spam e-mails contained materially false and misleading statements concerning, among other things, the acquisitions and development of multimillion dollar properties in China ("*e.g.,* Score One to Acquire $75 million Dalian Project," "China to Rival Detroit With New Facility"). The spam e-mail often predicted the news in the press releases and advised to "get on SREA before the news hits…" The spam e-mails contained no disclaimers.

143.     SREA coordinated the issuance of 13 press releases with the spam e-mail campaign. The press releases announced events such as the acquisition of a $75 million project in China, a partnership with a multimillion dollar developer, a potential agreement with a major brake manufacturer in China, and the prospect of building an auto exhibition center in China. Many of these press releases were false and misleading.

144.     Prior to the spam e-mail campaign, there was virtually no market for SREA stock. In the 90 days prior, SREA stock traded sporadically with prices ranging from $.00013 to $.22 per share, and volume ranging from 0 to 47,166 shares. Most of the trading volume during this period was placed by online brokerage accounts controlled by Chan and the former CFO of SREA to create the appearance of trading activity in the stock. From June 1, 2007 to June 13, 2007, the two weeks leading up to the spam e-mail campaign, SREA only traded a total of 12,200 shares on two trading days at $0.11 and $0.12 per share.

145.     The spam e-mail and press release campaign had an immediate and significant impact on the price and volume of SREA stock. On June 14, 2007, the day after the spam e-mail campaign commenced, SREA stock closed at $0.15 on trading volume of 15,400 shares. After this date, SREA stock price and volume sharply increased. On June 15, 2007, SREA closed at $0.20 on trading volume of 55,950 shares. From June 18, 2007 to July 2, 2007, when at least six other e-mails and three additional press releases were issued, the stock traded an average of 371,500 shares per day at prices ranging from $0.22 to $0.69, with daily volume during this period reaching a high of 572,531 shares.

### c.  SREA Dump

146.     In furtherance of the scheme, from on or about June 18, 2005 to on or about October 31, 2007, Berger knowingly, or recklessly, assisted Chan with selling 5.78 million

shares of SREA through at least four Nominee Accounts opened with Berger at Capital Growth. These sales generated gross proceeds of $1,472,376, of which Chan transferred approximately $426,491 to bank accounts held in his name or the names of the entities he controlled. Chan also transferred, or directed others to transfer, approximately $307,560 to Tribble, approximately $435,752 to the CFO of SREA, and at least $92,896 to a spammer.

147.    Chan opened these brokerage accounts and Berger provided him with online access information, trading details, and wire information from these accounts. All of these shares were received pursuant to SREA's fraudulent Form S-8 filing. Berger knew or was reckless in not knowing that these accounts were nominees for Chan and that these sales were made as part of a scheme to pump and dump SREA stock.

148.    There was no registration statement on file or in effect with the Commission or an applicable exemption when Chan and Berger sold the 5.78 million shares of SREA stock through the four Nominee Accounts.

### 8.   Physical Property Holdings, Inc.

149.    At all relevant times, PPYH, a Delaware corporation headquartered in Hong Kong, PRC, was purportedly in the business of buying, investing in, selling, renovating, and renting real estate in Hong Kong. PPYH's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and it filed annual and periodic reports with the Commission. PPYH's common stock was dually quoted on the OTCBB and Pink Sheets.

150.    From at least September 2007 to on or about December 2007, Chan, along with Berger, engaged in a fraudulent scheme to pump the price of PPYH stock through false and misleading spam e-mails and press releases. Chan played a central role in all aspects of the fraudulent scheme by consulting on the company's reverse merger, coordinating the issuance of

Form S-8 shares, creating trading activity in the stock prior to the spam e-mail campaign, opening brokerage accounts with Berger in the names of nominees and selling PPYH stock, and paying for PPYH's promotion from PPYH stock sale proceeds.

### a. PPYH Reverse Merger and Stock Issuance

151. On or about October 31, 2006, Physical Spa & Fitness, Inc. ("Physical Spa"), a U.S. public holding company for 17 spa and fitness centers in Hong Kong and mainland China, reverse merged with Ableforce International Limited, a British Virgin Islands company that owned five residential apartments in a high rise building in Hong Kong. After the reverse merger, this company was renamed Physical Property Holdings, Inc. Chan consulted the two companies on the reverse merger and provided a fairness opinion to the board of directors of Physical Spa on the merger. Physical Spa's board of directors relied solely on Chan's fairness opinion in deciding whether to approve the merger.

152. On or about October 13, 2006, PPYH filed a Form S-8 registration statement purporting to register the issuance of 3 million shares of PPYH stock to consultants for services rendered. These consultants did not provide consulting services to PPYH but were merely nominees for Chan to receive unrestricted shares of PPYH to dump into the market. The purported consultants' Form S-8 shares were either deposited into a brokerage account with Berger by Chan in their name, and/or the purported consultants transferred their shares to the same nominees who received SREA stock for deposit into brokerage accounts with Berger. These shares were the only unrestricted shares of PPYH in the market at the time they were issued and during the time period leading up to the spam e-mail campaign.

153. At all relevant times, PPYH was in poor financial condition and had very little business operations. In a Form 10-Q for the quarter ended September 30, 2007, PPYH reported

a net loss of $1,465,000, assets of $1,982,000, revenue of $22,000, and $0 in cash. PPYH's revenue was derived solely from rental income earned from the five residential apartment units in Hong Kong.

### b. PPYH Promotional Campaign and Market Effect

154.    From on or about September 22, 2007 to on or about October 29, 2007, PPYH was the subject of a spam e-mail campaign directed by Chan and Tribble, which was coordinated with a press release campaign by PPYH. The spam e-mails falsely claimed that PPYH acquired or "grabbed" "high profile" and "multi-million dollar" properties in the Hong Kong real estate market.

155.    PPYH issued eight press releases during the scheme which usually contained positive language boasting about potential multi-million dollar acquisition targets or real estate development projects. The press releases aggressively promoted the company's purported acquisition targets despite the fact that the company had no significant operations or assets. Some of the press releases contained false and misleading statements concerning the potential acquisition targets and the future growth of the company.

156.    There was virtually no market for PPYH stock prior to the spam e-mail campaign. From June 1, 2007 to September 23, 2007, PPYH traded a total of 34,800 shares on only 6 of 79 trading days, much of which is attributed to purchases and sales made by Chan through online trading accounts he owned or controlled, and Berger through his own Capital Growth account. Specifically, from on or about June 4, 2007 to on or about August 10, 2007, Chan, through these online accounts, purchased and sold a total of 33,500 PPYH shares at prices ranging from $.15 to $.25 – 96 percent of the total trading volume during that period. In May 2007, PPYH only traded on three days, of which Berger's purchases and sales comprised 67 percent of the trading

41

volume. On or about May 15, 2007, Berger purchased 5,000 shares of PPYH at $.30 per share for a total cost of $1,500. He then sold all of those shares on or about May 21, 2007 and May 24, 2007 at $.29 and $.25 per share, respectively, for an overall loss of $242.

157. The spam e-mail campaign had a significant and immediate effect on the price and volume of PPYH stock. On September 24, 2007, the first trading day after the spam e-mail campaign was launched, PPYH stock opened at $0.35, traded as high as $1.10, and closed at $0.55, on trading volume of 144,000 shares. Prior to September 24, 2007, PPYH stock had not traded since September 4, 2007 when the volume of the stock was 2,000 shares at $.25 per share. During the spam e-mail campaign, PPYH stock traded in a price range of $.25 to $1.1 with volume ranging from 0 to 147,280 shares.

### c. PPYH Dump

158. In furtherance of the scheme, from on or about September 24, 2007 to on or about December 11, 2007, Berger knowingly, or recklessly, assisted Chan with selling 336,800 shares of PPYH stock through a Nominee Account opened with Berger at Capital Growth. These shares were sold at prices ranging from $.25 to $.79 per share and generated gross proceeds of $146,013. Chan transferred at least $63,105 of the proceeds to his own bank accounts and transferred, or directed others to transfer, the remainder to individuals who promoted PPYH stock.

159. On the days that Chan sold PPYH through the Nominee Account those sales comprised between 30 and 79 percent of the day's trading volume.

160. There was no registration statement on file or in effect with the Commission or an applicable exemption when Chan and Berger sold the 336,800 shares of PPYH through the Nominee Account.

**D. False and Misleading Public Filings by CWTD, CDGT, MWIS, and GPPL**

161. On April 14, 2005 and April 18, 2006, CWTD filed false and misleading Forms 10-KSB for the fiscal years ended 2004 and 2005. CWTD's 2004 Form 10-KSB was signed and certified by Hui and Chan. CWTD's 2005 Form 10-KSB was signed by Hui.

162. On February 17, 2006, CDGT filed a false and misleading Form 10-KSB for the fiscal year ended 2005. This filing was signed and certified by Ng.

163. On March 30, 2006, MWIS filed a false and misleading Form 10-KSB for the fiscal year ended 2005. This filing was signed by Ben-Asulin and Broudo, and certified by Ben-Asulin and Broudo.

164. On April 18, 2006 and May 17, 2007, CHMS, now GPPL, filed false and misleading Forms 10-KSB for the fiscal years ended 2005 and 2006. These filings were signed and certified by Du.

165. Hui, Du, Ng, Ben-Asulin and Broudo certified that the filings made with the Commission contained no false or misleading statements when they knew the filings were false or had no basis to make such certifications.

166. Hui, Du, Ng, Ben-Asulin, and Broudo, in connection with their respective company's Form 10-KSB filings described in Paragraphs 162 to 166 above, made false and misleading statements concerning the price of and market for their respective issuer's stock and their beneficial ownership and control over millions of shares of stock. The statements concerning the price of and market for the company's stock were misleading because the filings failed to disclose their efforts to affect the price of their issuer's securities through unlawful promotional campaigns. The statements pertaining to the beneficial ownership and control of stock by Hui, Du, Ng, Ben-Asulin, and Broudo were also false because they did not accurately

reflect the shares owned by officers and directors of the company which were being held through nominee accounts.

167.    Hui, Du, Ng, Ben-Asulin, and Broudo caused their company to falsely report in their Forms 10-K and 10-KSB filings that its officers and directors had filed all reports required under Section 16(a) of the Exchange Act.

### E.    Improper and/or Fraudulent Form S-8 Issuances and Sales of Rule 144 Stock

#### 1.   Form S-8 Issuances

168.    A Form S-8 Registration Statement ("Form S-8") provides an abbreviated registration procedure for securities offered or sold to an issuer's employees as well as to consultants and advisers who provide *bona fide* services to the issuer and whose services are not provided in connection with capital-raising or promotional activities. In addition, Form S-8 is not available to register offers or sales of securities to either traditional employees or consultants and advisers where the issuer controls or directs the resale of the securities in the public market or the issuer or its affiliates directly or indirectly receives a percentage of the proceeds from such sales.

169.    PGCN, WWBP, CHMS, MWIS, SREA, and PPYH improperly registered shares of stock on Form S-8 registration statements that were filed with the Commission. These registration statements are as follows:

a) On or about November 29, 2004, PGCN filed a Form S-8 purporting to register the issuance of 3 million shares of PGCN stock.

b) On or about May 5, 2005, CHMS filed a Form S-8, signed by Du, purporting to register the issuance of 7 million shares of CHMS stock.

c) On or about May 20, 2005, WWBP filed a Form S-8 purporting to register the issuance of 5 million shares of WWBP stock.

d) On or about July 29, 2005, MWIS filed a Form S-8 with the Commission, signed by Ben-Asulin and Broudo, purporting to register the issuance of 5 million shares of MWIS stock.

e) On or about November 2, 2005, CHMS filed a Form S-8, signed by Du, purporting to register the issuance of 2 million shares of CHMS stock.

f) On or about July 31, 2006, SREA filed a Form S-8, signed by Lau, purporting to register the issuance of 6 million shares of SREA stock.

g) On or about October 13, 2006, PPYH filed a Form S-8, signed by Lau, purporting to register the issuance of 3 million shares of PPYH stock.

170.    These registration statements did not properly register the issuance of stock because the shares were provided in connection with capital raising and/or promotional activities.

171.    PGCN's, SREA's, and MWIS' registration statements also were invalid because these issuers or individuals who controlled these issuers received a percentage of the proceeds from the sales of the Form S-8 stock. For example, on or about August 26, 2005, PGCN received a wire transfer for approximately $85,949 which, Hui, Chan, Tribble, or others acting at their direction, transferred from the proceeds of the sale of PGCN Form S-8 stock through a Nominee Account. On or about August 8, 2007, SREA's CFO received a wire transfer for approximately $127,745 which Chan transferred, or directed others to transfer, from the proceeds of the sale of SREA Form S-8 stock through a Nominee Account. From on or about August 4, 2005 to on or about October 13, 2005, Ben-Asulin and Broudo improperly received

approximately $900,000 in proceeds from the sale of MWIS Form S-8 stock through a Nominee Account.

172. In addition, the Form S-8 registration statements filed by MWIS contained false statements. Specifically, each of these registration statements and attachments thereto contained language indicating that the Form S-8 shares were being issued for "valid services rendered and do not relate to any investor relation services…" These representations, among others, were false.

### 2. Rule 144 Safe Harbor

173. Rule 144 provides a safe harbor or exception from the registration requirements for securities sales, including sales by affiliates, if certain requirements – such as accurate public information, volume limitations, holding period, manner of sale and the notice filings pursuant to Forms 144 – are met. In order to have the exception apply, the unregistered sales must comply with all of Rule 144's requirements.

174. Many of the Public Companies' securities held by the nominees were initially restricted securities which could lawfully be sold only if they were subsequently registered, or if they were sold in transactions exempt from the registration requires of Section 5 of the Securities Act. In attempt to rely on an exemption, the defendants caused to be filed Forms 144 that contained materially false and misleading statements. The defendants also exceeded the volume limitation requirements under Rule 144 and did not file a notice-of-sale as required by Rule 144. In addition, they relied on the exemption for the purpose of evading the registration requirements.

175.    Because the Forms 144 were false and misleading and/or the defendants did not meet the conditions of Rule 144, reliance on this safe harbor was invalid, and therefore all of the defendants violated Section 5 of the Securities Act.   Several examples are provided below:

a) From on or about January 24, 2006 to on or about May 22, 2006, Berger, on behalf of Hui, Tribble, and Chan, filed four false and misleading Form 144 notices-of-sale on behalf of two Nominee Accounts.  Berger filed these notices-of-sale in connection with the sale of 1,011,422 shares of CWTD that were made through two Nominee Accounts between January 8, 2006 and May 19, 2006.

b) On or about October 16, 2006, Berger, on behalf of Hui, filed a false and misleading Form 144 notice of sale for sale of 340,650 CWTD shares that were sold on or about September 18, 2006 through a Nominee Account.  Berger, Hui, Tribble, and Chan did not file a notice-of-sale for approximately 3.7 million shares of CWTD that were sold through seven Nominee Accounts.

c) From on or about July 27, 2005 to on or about August 2, 2005, Berger assisted Ben-Asulin and Broudo with selling 933,014 shares of MWIS, which at the time these sales were made, exceeded one percent of the total outstanding shares of MWIS. From on or about January 10, 2006 to on or about February 10, 2006, Berger, Ben-Asulin, and Broudo sold an additional 3,507,215 shares when there was no registration statement on file with the Commission or in effect.

d) From on or about July 8, 2005 to on or about August 19, 2005, Berger assisted Hui, Tribble, and Chan in selling 500,000 shares of PGCN through a Nominee Account while no registration statement was in effect or on file with the Commission.

e) From on or about February 19, 2005 to on or about May 5, 2006, Berger assisted Hui, Tribble, and Chan with selling 1,493,260 shares of PGCN while no registration statement was on file or in effect with the Commission.

## F. Hui, Du, Ng, Broudo and Ben-Asulin Fail to Report Sales of Their Respective Issuer's Stock

176.   Hui, as an officer of CWTD, Du as an officer of CHMS (now GPPL), Ng as an officer of CDGT, and Ben-Asulin and Broudo, as either an officer or director of MWIS, were each required to publicly file reports with the Commission disclosing their change in beneficial ownership of their respective issuer's stock, and their acquisition or disposition of their respective issuer's stock.

177.   None of these individuals filed any reports with the Commission disclosing their acquisition or disposition of the shares of their respective issuers' stock. Specifically,

a) Hui did not disclose the acquisition or disposition of at least 4,814,868 shares of CWTD stock through ten Nominee Accounts.

b) Du did not disclose the acquisition or disposition of at least 3,277,983 shares of CHMS stock through three Nominee Accounts.

c) Ng did not disclose the acquisition or disposition of at least 1,876,256 shares of CDGT stock through two Nominee Accounts.

d) Ben-Asulin and Broudo did not disclose the acquisition or disposition of nearly 12 million shares of MWIS stock through two Nominee Accounts.

## FIRST CLAIM

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

178.   Paragraphs 1 through 177 are realleged and incorporated herein by reference.

179.   As a result of the conduct alleged herein, defendants Berger, Tribble, Hui, Chan,

Du, Ng, Broudo, Ben-Asulin, CDGT, MWIS, and GPPL, directly or indirectly, made use of the

means or instruments of transportation or communication in interstate commerce or of the mails,

to offer to sell or to sell securities, or to carry or cause such securities to be carried through the

mails or in interstate commerce for the purpose of sale or for delivery after sale.

180.   No valid registration statement has been filed with the Commission or has been in

effect with respect to any offering or sale alleged herein.

181.   By engaging in the foregoing conduct, defendants Berger, Tribble, Hui, Chan, Du,

Ng, Broudo, Ben-Asulin, CDGT, MWIS, and GPPL violated Sections 5(a) and 5(c) of the

Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

182.   In the alternative, by engaging in the foregoing conduct, defendant Berger aided

and abetted violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and

77e(c)].

## SECOND CLAIM

### Violations of Section 17(a) of the Securities Act,
### Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Against All Defendants)

183.   Paragraphs 1 through 182 are realleged and incorporated herein by reference.

184.   As a result of the conduct alleged herein, defendants Berger, Tribble, Hui, Chan,

Du, Ng, Broudo, Ben-Asulin, CDGT, MWIS, and GPPL, directly or indirectly, by use of the

means or instruments of transportation and communication in interstate commerce, or the means

and instrumentalities of interstate commerce, or of the mails, or the facilities of a national

securities exchange, in the offer or sale or in connection with the purchase or sale of some or all

of the Public Companies' securities, knowingly or recklessly: (a) employed devices, schemes or

artifices to defraud; (b) obtained money or property by means of, and made, untrue statements of

material fact or omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon offerees, purchasers and prospective purchasers of securities.

185.    By engaging in the foregoing conduct, defendants Berger, Tribble, Hui, Chan, Du,

Ng, Broudo, Ben-Asulin, CDGT, MWIS, and GPPL violated Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

186.    In the alternative, by engaging in the foregoing conduct, defendant Berger aided

and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-

5].

## THIRD CLAIM

### Violations of Section 13(a) of the Exchange Act and
### Rules 12b-20, 13a-1 and 13a-11 thereunder
### (Against All Defendants, except Berger, Tribble, and Chan)

187.    Paragraphs 1 through 186 are realleged and incorporated herein by reference.

188.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1 and

13a-11 thereunder [17 C.F.R. §§ 240.13a-1 and 240.13a-11], require issuers of registered

securities to file with the Commission factually accurate annual and current reports. Exchange

Act Rule 12b-20 [17 C.F.R. § 240.12b-20] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

189.     By engaging in the foregoing conduct, defendants MWIS and GPPL violated Section 13(a) of the Exchange Act, and Rules 12b-20 and 13a-1 thereunder.

190.     By engaging in the foregoing conduct, defendant CDGT violated Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-11 thereunder.

191.     By engaging in the foregoing conduct, defendants Hui, Broudo, Ben-Asulin, and Du aided and abetted violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder.

192.     By engaging in the foregoing conduct, defendant Ng aided and abetted violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 thereunder.

## FOURTH CLAIM

### Violations of Exchange Act Rule 13a-14
### (Against Hui, Du, Ng, Broudo, and Ben-Asulin)

193.     Paragraphs 1 through 192 are realleged and incorporated herein by reference.

194.     Defendants Hui, Du, Ng, Broudo and Ben-Asulin each certified in their respective issuer's annual reports filed on Form 10-K and/or Form 10-KSB that, among other things, he or she reviewed each of the reports and, based on his or her knowledge, the reports: (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and (ii) included financial statements and other financial information that fairly

presented, in all material respects, the issuer's financial condition, results of operations and cash flows.

195.    By engaging in the foregoing conduct, defendants Hui, Du, Ng, Broudo and Ben-Asulin violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## FIFTH CLAIM

### Violations of Section 16(a) of the Exchange Act
### and Rules 16a-2 and 16a-3 Thereunder
### (Against Hui, Du, Ng, Broudo, and Ben-Asulin)

196.    Paragraphs 1 through 195 are realleged and incorporated herein by reference.

197.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 [17 C.F.R. §§ 240.16a-2 and 240.16a-3] thereunder, require, among other things, persons who are directors or officers of an issuer of securities registered under the Exchange Act to timely file accurate Forms 3 and 4 with the Commission disclosing information about their holdings and trading in the corresponding issuer's securities.

198.    By engaging in the forgoing conduct, defendants Hui, Du, Ng, Broudo, and Ben-Asulin each violated Section 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder because each owned and traded their respective issuer's securities and failed to file Forms 3 or 4 and/or filed inaccurate Forms 3 and 4 with the Commission.

**WHEREFORE**, the Commission respectfully requests that this Court:

## I.

Issue an injunction permanently restraining and enjoining defendants Berger, Tribble, and Chan from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Issue an injunction permanently restraining and enjoining defendants Hui, Ben-Asulin, Broudo, and Du from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; Sections 10(b) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78p], and Rules 10b-5, 13a-14, 16a-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.16a-2, and 240.16a-3]; and from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

## III.

Issue an injunction permanently restraining and enjoining defendant Ng from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; Sections 10(b) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78p], and Rules 10b-5, 13a-14, 16a-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.16a-2, and 240.16a-3]; and from aiding and abetting violations of Section 13(a) of the Exchange Act [15

U.S.C. §§ 78m(a)], and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 13a-11].

## IV.

Issue an injunction permanently restraining and enjoining defendant CDGT from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; and Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-11].

## V.

Issue an injunction permanently restraining and enjoining defendants MWIS and GPPL from violations of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-1].

## VI.

Order defendants Berger, Tribble, Hui, Chan, Du, Ben-Asulin, Broudo, GPPL, CDGT, and MWIS to disgorge all ill-gotten gains derived from the activities set forth in this Complaint, together with prejudgment interest against Berger, Tribble, Hui, Chan, Du, and GPPL.

## VII.

Order defendants Berger, Chan, Du, and GPPL to pay civil penalties, pursuant to Section 20(d) of the Securities Act and/or Section 21(d)(3) of the Exchange Act, as a result of the violations set forth herein.

## VIII.

Pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, prohibit defendants Hui, Du, Ng, Ben-Asulin, and Broudo from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## IX.

Pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act, prohibit defendants Berger, Tribble, Hui, Chan, Du, Ben-Asulin, and Broudo from participating in any offering of a penny stock.

## X.

Order such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

s/ Mary P. Hansen
Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos
David S. Horowitz
Mary P. Hansen
Jennifer L. Crawford

Attorneys for Plaintiff:
**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
E-mail: hawked@sec.gov
        greenberge@sec.gov
        boujoukosj@sec.gov
        horowitzd@sec.gov
        hansenm@sec.gov
        crawfordj@sec.gov

**LOCAL COUNSEL:**

**BARBARA L. MCQUADE**
**UNITED STATES ATTORNEY**

s/ with the consent of Peter A. Caplan

By:     PETER A. CAPLAN
        Assistant U.S. Attorney
        211 W. Fort Street, Ste. 2001
        Detroit, MI 48226
        (313) 226-9784
        P-30643
        Email: peter.caplan@usdoj.gov

Dated:  February 1, 2011

56